J. S. Keator Lumber Co. and others vs. The St. Croix Boom Corp.

J. S. KEATOR LUMBER COMPANY and others, Appellants, vs. THE ST. CROIX BOOM CORPORATION, Respondent.

*April 19 — September 18, 1888.*

*Navigable waters leading into the Mississippi: Obstructions: Booms: Constitutional law: " Concurrent jurisdiction " of states over boundary river: Who may complain of infringement: Negligence of boom company in performing duties imposed by charter: Court and jury.*

1. The provision of the ordinance of 1787 (incorporated also into the acts of Congress enabling Wisconsin and Minnesota to organize state governments, and into the constitutions of said states) that " the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, . . . . without any tax, impost, or duty therefor," was not intended to prevent obstructions to the navigation of such waters, but to prohibit the levying of a tax on such navigation. And in the absence of other legislation by Congress, such states may authorize the construction in such waters of booms for the interception, storage, and handling of logs, even though they will materially interfere with navigation by steamboats and other water-craft.

2. Where a navigable river leading into the Mississippi forms the common boundary to Wisconsin and Minnesota, and such states have, by their constitutions, " concurrent jurisdiction " thereon, either state, acting independently of the other, may, in the absence of commercial regulations by Congress relating to said river, authorize the construction of such booms therein within its own territory, though it may not, as against the other, assume or authorize the

assumption of permanent and exclusive occupancy, possession, and control of the entire navigable portions of the river. ORTON, J., dissents.

3. If Minnesota has attempted to grant to a corporation authority to construct booms in such a river within the territory of Wisconsin, or if such corporation has assumed, under its charter, to exercise such authority, mere private parties, who claim to have been damaged by the obstruction of navigation, cannot maintain an action therefor on the ground that Minnesota has exceeded its jurisdiction and infringed upon that of Wisconsin.

4. Such a corporation is not liable for the obstruction of navigation by an unusual jam of logs in its boom, which, under its charter, it was bound to use all possible efforts and the speediest means to remove, merely because it had failed to go outside of the scope of its charter and use a lake on the Wisconsin side, which could have been made available for the storage of logs in such a way that the booms could more easily be kept clear.

5. The liability of the defendant corporation in this case, if any, arising out of its failure to perform, or negligence in the performance of, some of the duties imposed by its charter, and the facts and the inferences to be drawn therefrom being in dispute, a nonsuit was improperly granted.

APPEAL from the Circuit Court for *St. Croix* County. The following statement of the case was prepared by Mr. Justice CASSODAY:

This action was brought to recover damages alleged to have been sustained by Walker, Judd & Veazie, in the summer of 1883, by reason of a jam of saw-logs in the St. Croix river, caused by the acts and negligence of the defendant and its booming works, and which damages were transferred to the plaintiffs. It is alleged in the complaint, among other things, in effect, that Walker, Judd & Veazie had for many years been engaged in cutting, hauling, banking, and driving down said river large quantities of saw-logs each year for the purpose of manufacturing the same into lumber at their mills at Marine, on the Minnesota side of the river, and shipping such lumber therefrom, by steamboats or barges in tow of steamboats, and in rafts and

floats, to St. Paul, and various places along the St. Croix
and Mississippi rivers; that they were merchants at Marine,
and transported their goods to and from that place in
steamboats; that they had no other means of transporta-
tion; that they owned the steamboat "G. B. Knapp;" that
in June, July, and August, 1883, the defendant, under its
charter from Minnesota, granted February 27, 1856, and
February 28, 1870, at a point below Marine and about three
miles above Stillwater, on the Minnesota side of said river,
erected and maintained a boom and other obstructions in
and entirely across the river, with full knowledge that the
river would thereby be wholly obstructed, and would en-
tirely cut off the navigation of boats thereon, contrary to
the provisions of its charter; that the defendant had so
obstructed the river in 1880, 1881, and 1882; that for the
five years previous the usual quantity of logs cut and put
into said river above said boom had been from two hun-
dred and fifty to three hundred millions feet per year; that
in the spring of 1883 the defendant had reasonable cause to
believe, and knew, that the quantity of logs to be received
in its booms that season would be about three hundred mill-
ions feet; that June 13, 1883, the defendant's boom became
crowded and jammed with logs; that the same was caused
by the careless and negligent handling of said boom and
the logs therein by the defendant, for the reason that the
defendant had neglected and purposely failed and refused
to make proper preparations for the receiving of said logs
and the assorting of the same in such a manner as to pre-
vent the obstruction of the navigation of the river and the
channel thereof; that at that time the boom became filled
with logs, and so jammed and crowded together that, com-
mencing at a point on the Wisconsin side about three miles
above Stillwater, and extending northward to a point not
less than five miles above Marine, being a distance of about
fifteen miles, the river and the channel thereof were filled

and obstructed the entire distance mentioned, so that no part
part of the river between those points could be navigated by
steamboats, barges, or other vessels; that the river between
those points remained so obstructed and in such a condition
that no part of it could be navigated until August 7, 1883,
being a period of fifty-five days; that said jam caused the
water to set back and damage the premises of Walker, Judd
& Veazie; that said claims for damages were sold and
assigned to the plaintiffs.    Numerous items of specific dam-
ages are alleged, and judgment demanded for $148,500.

The answer consists largely of admissions and denials,
and a justification of all it did or neglected under acts of
the territory and state of Minnesota, constituting its char-
ter and authority, to wit, the act of May 17, 1851, incorpo-
rating the St. Croix Boom Company; an act to organize
the St. Croix Boom, of February 27, 1856, and the several
amendments and re-enactments thereof, including that of
February 28, 1870, whereby the defendant was incorporated
and organized; and then, among other things, the answer
alleges, in effect, that the St. Croix river is 200 miles in
length; that from its junction with the Mississippi, at its
mouth, for a distance of 150 miles northerly, it constitutes
the boundary line between the states of Minnesota and
Wisconsin; that said river has numerous tributaries flowing
into it from the east and the west,— the most notable of
which are named,— being twenty-three in number, all of
which are lumbering streams, navigable for the transporta-
tion of logs, timber, and lumber,— some of them being
more than 100 miles in length, and many having tributaries
which are lumbering streams and navigable for logs; that
said river and its tributaries drain an area of country of
more than 20,000 square miles in extent; that the same is
rich in pine and other timber; that the annual cut of such
logs had for the past few years exceeded 400,000,000 feet,
the separate owners, grades, and lots of which are distin-

guished by some 1,700 different marks; that such logs are floated down the rivers in the spring floods, and become intermingled in one common mass; that the St. Croix river is only navigable for Mississippi steamboats up to the city of Stillwater; that Marine is twelve miles above Stillwater; that from Stillwater to Taylor's Falls, a distance of thirty miles, the same is navigable only for boats of the smallest class used in navigable streams; that even for such boats, save in periods of high water, navigation is at all times precarious and uncertain, and at times substantially impracticable with any sort of boat; that between Stillwater and Taylor's Falls the river is narrow, shallow, abounds in sloughs, islands, sand-banks, and is tortuous, intricate, and hard to navigate; that the navigation thereon is very inconsiderable, and for the last five years had been almost entirely confined to a single boat running regularly between those points; that under its charter it was the duty of the defendant to collect, take charge of, sort, separate, and raft at its boom all logs, timber, and lumber coming down the river to that point; that the foot of its boom was about one mile above Stillwater, and extended up to Titcomb's Landing, which is about five miles above Stillwater and six miles below Marine; that in the construction and maintenance of said boom the defendant had employed the highest degree of skill and labor, and adopted the most approved plan for a boom at that point, and operated the same with the highest skill and diligence, and as required by its charter; that it nowhere extended entirely across the river or interfered with the navigation thereof; that the upper boom mentioned in the charter had many years before been abandoned; that from the head of the lake down for about three miles were fixed a large number of booms owned by private parties for the holding of logs; that the log jam of June, 1883, resulted from an unusual rise in the St. Croix and all its tributaries, occurring nearly simultaneously,

whereby nearly all the logs therein were driven down said several streams by the owners thereof, including Walker, Judd & Veazie, with the greatest rapidity, and without any fault or agency of the defendant, and the same resulted in filling the river from the head of the defendant's boom upwards for a distance of several miles above Marine; that there was no other closing up of said river during that year; that, during the time, the river was so full of logs from the head of the defendant's boom up the stream that the same could not be navigated by steamboats, but that, during all of that period and that season, a convenient and feasible channel was kept open for steamboats, barges, and general purposes from the foot of the defendant's boom to the head thereof.

At the close of all the testimony, and on motion of the defendant, the court granted a nonsuit; and from the judgment entered thereon the plaintiffs appeal.

The following portions of the defendant's charter were referred to on the argument:

"Sec. 11. The said *St. Croix Boom Corporation* are hereby authorized and empowered to construct, and shall construct, maintain, and keep in good order and repair as provided herein, two good, substantial booms upon the river St. Croix; one at such points between the head of Cedar Bend, so called, and Rock Island, as they may select, to be known and designated as the upper boom; the other at such points between the head of Lake St. Croix and Titcomb's Landing, so called, as they may select, to be known and designated as the lower boom. And said corporation may further construct, maintain, and keep, between Titcomb's Landing and the landing at Marine Mills, such additional booms as they may deem necessary or convenient for the purpose of holding, controlling, or securing any logs or timber that may float or be driven down the St. Croix river and its tributaries, and may intercept, stop, and take exclusive

possession of any such logs or timber, and secure the same
within any of their said booms, whenever said corporation
shall deem it prudent or necessary so to do, in which case
it shall be the duty of said corporation to drive said logs or
timber from said last-named additional booms to and within
the limits of said lower boom as soon as practicable, at
their own expense.   All logs or timber floating or driven
down the said river St. Croix shall be collected by said cor-
poration in said boom, and shall be assorted according to
their several marks, and well rafted in good rigging, and
delivered at or near the foot of said lower boom to the
owner of such logs or timber, or to such person as such
owner may designate: *provided*, that hereafter said corpo-
ration may, at their option, omit to maintain or keep up, or
raft logs or timber at, their said upper boom; and in case
and so long as said upper boom is not kept up, except for
the purpose of rafting logs or timber for mill-owners to be
manufactured here between said booms, as hereinafter pro-
vided, it shall be the duty of log-owners to drive all of
their logs or timber within the limits of said lower boom,
which said corporation do not intercept and boom before
the same reach the said lower boom, as provided afore-
said. . . .

"Sec. 12.   All logs or timber floating or driven down
the said St. Croix river shall, for the purposes contemplated
in this act, be deemed to be in possession and subject to the
control and direction of said corporation whenever the said
logs or timber pass below the landing at Marine Mills, and
said corporation shall collect and carefully sort and raft
in rigging according to their several marks, rafting each
mark separately, all logs or timber which may come within
the limits of said lower boom, and safely secure the same
at or near the foot of said boom, in such manner that said
rafts may be taken possession of and removed by the own-
ers thereof without hinderance or inconvenience. . . .

"Sec. 13. . . . They shall employ all the men and furnish all the material necessary to raft and deliver logs, and use all reasonable exertion to effect such delivery as soon as possible, and shall, when practicable, notify the owner of any logs ready for delivery, or his agent, of the time when such logs must be removed. The owner of logs or timber rafted and ready for delivery as provided herein, shall receive and take away the same within thirty-six hours from the time such logs or timber is so made ready for delivery. Whenever any unreasonable delay in delivering logs ·or timber, as provided herein, shall be caused by the neglect of said corporation to employ sufficient men or to furnish necessary material or tools to raft and deliver such logs or timber, or if such delay shall be caused by any defect in the construction of said boom, or by any failure to keep the same in good repair, or from any cause within the power of said corporation to prevent or remove, then, in such case, said corporation shall be liable to the owner of such logs or timber so detained or delayed for the damages caused by such delay: *provided*, said corporation shall not be liable for any delay in rafting or delivering logs or timber caused by low water or by an unusual or extraordinary press or jam of logs or timber within the limits of their said boom, if such corporation shall use all reasonable and timely efforts to prevent or shorten the period of such delay; and for the damage caused by any failure or neglect to comply with any of the provisions of this act the said corporation shall be liable to any person sustaining damage thereby, and such damage may be collected by action in any court of competent jurisdiction. . . .

"Sec. 16. Whenever, in the due and vigilant exercise of all the powers and privileges conferred by its charter, logs or other timber shall enter its booms faster than the same can reasonably be rafted by the said corporation without obstruction to the channel as herein provided, or shall,

without fault or negligence of the corporation, using due and proper care and diligence, pass through or out of the said boom, the corporation is hereby authorized and required to pick up and collect all such logs in booms of convenient size, substantially constructed. . . .

"Sec. 18. The said corporation shall always and at all times give free passage to all rafts, steamboats, keel-boats, or other water-craft navigating the said river St. Croix, without any hinderance or delay by reason of said booms or the logs therein confined; and shall whenever, from unusual press or jam of logs or other cause, the channel of said river shall become so obstructed that the craft aforesaid cannot pass through, use all possible efforts and the most efficient and speediest means to remove such obstruction and allow such water-craft to pass through without unnecessary delay; and should any rafts or parts of rafts of logs or other timber or lumber float into said booms, the corporation shall deliver the same, without delay, for such reasonable compensation as shall indemnify the said corporation for so delivering the same.

"Sec. 19. Said corporation or its agents shall have the right, at any time, to enter any boom or slough between said upper and lower booms for the purpose of taking therefrom any logs or timber that by this act the said corporation are required to drive to the said lower boom. . . .

"Sec. 21. The said corporation shall have the right to enter upon and occupy any land that may be necessary for properly conducting their business as herein required; and in case of so entering upon or occupying lands, if any person or persons shall suffer loss or damage thereby, the corporation shall make just compensation therefor," as therein provided.

For the appellants there were briefs by *Fayette Marsh* and *John W. Bashford*, and oral argument by *Mr. Marsh*. They contended, *inter alia*, that as Wisconsin and Minne-

sota have "concurrent jurisdiction" over the St. Croix river, the booms and other works constructed and maintained by the defendant could be authorized only by the mutual concurrent consent of both states to the occupation of the river for that purpose, granted by the concurrent act of the legislatures of both states. The consent or concurrence of neither state should be limited to the water within its own borders, for its rights are as broad as the stream and its concurrence should be as broad as its rights. *Att'y Gen. v. D. & B. B. R. Co.* 27 N. J. Eq. 631, 647; *President, Managers, etc. v. Trenton City Bridge Co.* 13 id. 46; *Middle Bridge Corp. v. Marks,* 26 Me. 326; *Willson v. Black Bird C. M. Co.* 2 Pet. 245; *Pennsylvania v. Wheeling & B. Bridge Co.* 13 How. 518–565; *S. C.* 18 id. 421; *Gilman v. Philadelphia,* 3 Wall. 721–727; *Henderson v. Mayor of N. Y.* 92 U. S. 259; *Pound v. Turck,* 95 id. 459–462; *Wisconsin v. Duluth,* 96 id. 379; *Mobile Co. v. Kimball,* 102 id. 691; *Bridge Co. v. U. S.* 105 id. 470–480; *Escanaba Co. v. Chicago,* 107 id. 678–680; *Miller v. Mayor of N. Y.* 109 id. 385–396; *Cardwell v. American Bridge Co.* 113 id. 205–211; *Sweeney v. C., M. & St. P. R. Co.* 60 Wis. 67. If Minnesota could not grant to the defendant any right to erect its booms in the navigable water of the river, or otherwise to obstruct the navigation of that river, then, such attempted exercise of jurisdiction being void, the defendant stands in the same position as if it had no authority and was standing upon its common-law rights. It entirely obstructed the navigation of the river for more than six weeks, and continued to partially obstruct the same for the whole season; and, in fact, its piling, piers, and booms are so made and constructed as to constitute a partial and permanent obstruction. Such an obstruction is unlawful and a nuisance. *Walker v. Shepardson,* 2 Wis. 384; *State v. St. Croix Boom Corp.* 60 id. 565; *Diedrich v. N. W. U. R. Co.* 42 id. 249; *Enos v. Hamilton,* 24 id. 658; Gould on Waters,

sec. 97. If the obstruction was lawful, the question whether it continued beyond a reasonable length of time, according to the course of navigation, is a question of fact for the jury, and it is not a question, in any sense, of the convenience of the defendant or the parties whom it represented. In determining whether the obstruction was reasonable or not it becomes necessary to ascertain how the defendant might have used the waters of the St. Croix river without continuing the obstruction for so long a period. Under ch. 70, R. S., the defendant might rightfully have used the sloughs, lakes, and other navigable waters adjacent to the river; and, it being its paramount duty to obstruct the navigation of the stream as little as possible, it clearly became its duty to use these bodies of navigable water for the purpose of floating and storing logs in such a manner as not to interrupt the navigation in the main channel, and so as to relieve the blockade with all possible expedition. See *Stevens Point Boom Co. v. Reilly*, 46 Wis. 243; *Grand Rapids Booming Co. v. Jarvis*, 30 Mich. 319; *McPheters v. Moose R. L. D. Co.* 78 Me. 329.

If it were conceded that Minnesota could, without the concurrence of Wisconsin, grant any powers to the defendant over the navigable waters of the St. Croix river, still, if the defendant in any manner exceeded the power granted, the grant or privilege will be no protection. *Missouri R. Packet Co. v. H. & St. J. R. Co.* 2 Fed. Rep. 285; *State v. Parrott*, 17 Am. Rep. 5; *Comm. v. New Bedford Bridge Co.* 2 Gray, 353; *Cox v. State*, 3 Blackf. 193; *Hickok v. Hine*, 23 Ohio St. 523; *Renwick v. Morris*, 3 Hill, 621; *S. C.* 7 id. 575.

The evidence shows that the cause of action passed to A. T. Jenks, by the assignment of the firm of Walker, Judd & Veazie, and by him was sold to the plaintiffs in this action, and the money received therefor paid *pro rata* to the creditors of Walker, Judd & Veazie. This was an

assignable claim. *Gates v. N. P. R. Co.* 64 Wis. 64; *Boese v. King*, 108 U. S. 379. The assignment was held void as to creditors not consenting thereto, by the supreme court of Minnesota. No one but a creditor can raise the question as to the validity of the assignment. It was voidable, but not void, and could only be avoided by a creditor, or assignee, or receiver, under the statute, and in an action brought for that purpose. Bishop on Insolvency, secs. 228–230; *National M. & T. Bank v. Eagle Sugar Refinery*, 109 Mass. 38; *McMaster v. Campbell*, 41 Mich. 513; *Freeland v. Freeland*, 102 Mass. 477; *Dunn v. Dunn*, 82 Ind. 42; *Hill v. Pine River Bank*, 45 N. H. 309; *Watson v. Tusten*, 49 Miss. 575; Wait on Fraud. Conv. 561, note 2.

*R. H. Start* and *J. N. Castle*, for the respondent, argued, among other things, that the defendant is a *quasi* public corporation, an agent of the state of Minnesota for the improvement of the St. Croix river, and its works are to be regarded as improvements in the aid of navigation and absolutely necessary to the successful prosecution of the commerce which must pass down this river on the way to the markets. *Cohn v. Wausau Boom Co.* 47 Wis. 314; *Hollister v. Union Co.* 9 Conn. 436; *Black R. Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 684; *Wis. R. Imp. Co. v. Lyons*, 30 id. 61; *Edwards v. Wausau Boom Co.* 67 id. 463; *Stevens Point Boom Co. v. Reilly*, 46 id. 242; *Union Mill Co. v. Shores*, 66 id. 476; *Osborne v. Knife Falls Boom Corp.* 32 Minn. 412; *Cotton v. Miss. & R. R. Boom Co.* 22 id. 372; *Weaver v. Miss. & R. R. Boom Co.* 28 id. 534; *Watt v. Tittabawasse Boom Co.* 52 Mich. 203; *Duluth Lumber Co. v. St. Louis Boom & Imp. Co.* 17 Fed. Rep. 419; *Pound v. Turck*, 95 U. S. 459; *Heerman v. Beef Slough M. Co.* 1 Fed. Rep. 160; *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214; *Grand Rapids Booming Co. v. Jarvis*, 30 Mich. 308; *Perry v. Wilson*, 7 Mass. 393; *Lawler v. Baring Boom Co.* 56 Me. 443.

The state of Minnesota had the right, notwithstanding

the ordinance of 1787 and the provisions of her constitution, to authorize the improvement of the river in the manner designated in the charter of the defendant; and she is the sole judge of what improvements the public interests require and how and where they shall be made, whether by dams, piers, and booms, or otherwise, and such determination is conclusive until Congress sees fit to interfere for the protection of interstate or foreign commerce. *Wis. R. Imp. Co. v. Manson,* 43 Wis. 255; *Benjamin v. Manistee R. Imp. Co.* 42 Mich. 628; *Huse v. Glover,* 119 U. S. 543; *Sands v. Manistee R. Imp. Co.* 123 U. S. 288; *Hamilton v. V., S. & P. R. Co.* 119 U. S. 280; Gould on Waters, sec. 133, and note 2; *Woodman v. Kilbourn M. Co.* 1 Biss. 546. The consent of Wisconsin is not necessary to enable Minnesota to lawfully make such improvements in aid of the navigation of this river as commerce and the public interests demand. The fact that Minnesota has concurrent jurisdiction on the whole river gives her the right thus to improve the navigation. *Smith v. St. Croix Boom Corp.* U. S. C. C. Dist. of Minn. June term, 1886; *Craig v. Kline,* 65 Pa. St. 399; Gould on Waters, 82, notes 5, 6; *Marshall v. Grimes,* 41 Miss. 27; *Jones v. Johnson,* 2 Ala. 746.

It appearing that defendant's works are necessary to aid and improve the navigation of their common highway for the public use, and equally benefit the citizens of both states, it must be presumed in the absence of anything to the contrary that the consent of the state of Wisconsin is given, for such consent clearly falls within the rule of comity between the states. *Hunt v. K. & M. Bridge Co.* 11 Kan. 435; *Land Grant R. Co. v. Comm'rs,* 6 id. 254; *Runyan v. Coster's Lessee,* 14 Pet. 122; *Bard v. Poole,* 12 N. Y. 495; *Conway v. Taylor's Ex'rs,* 1 Black, 603, 629, 630. But if it were held that Minnesota has no right to construct any works in this river for the improvement of its navigation, extending beyond the thread of the main channel, without the consent of Wisconsin, yet in the absence of

any legislation on the subject by Congress she clearly has the right, notwithstanding the ordinance of 1787, to construct or authorize the construction of any works in the navigable waters of this river within her territorial limits, which she may deem the interests of commerce and navigation require, even though such works should materially or entirely obstruct the navigation of such waters by steamboats. *Pound v. Turck,* 95 U. S. 495; Gould on Waters, secs. 130–132; *Sands v. Manistee R. Imp. Co.* 123 U. S. 288; *Hamilton v. V., S. & P. R. Co.* 119 id. 280; *Huse v. Glover,* id. 543; *Heerman v. Beef Slough M. Co.* 1 Fed. Rep. 160; *State v. Eau Claire,* 40 Wis. 533.

If the defendant has provided a sufficient channel for the passage and navigation of steamboats in that portion of the river occupied by its works, which it is conceded it has done, these plaintiffs have no ground of complaint although the works extend into and upon the soil of Wisconsin. The state of Wisconsin is the only party that can complain. *Cohn v. Wausau Boom Co.* 47 Wis. 314.

Defendant's boom and works would not be unlawful structures if they had been erected and maintained without the authority of its charter. The log-owners, or the defendant as their agent, as an incident of the common-law right of navigation, would have the right to maintain and operate this boom. *Brig City of Erie v. Canfield,* 27 Mich. 481; *McPheters v. Moose R. L. D. Co.* 78 Me. 329; *Canfield v. Brig City of Erie,* 1 Mich. N. P. 105; *People v. Horton,* 64 N. Y. 610; *Att'y Gen. v. Evart Booming Co.* 34 Mich. 462; *Hayward v. Knapp,* 23 Minn. 430; *Davis v. Winslow,* 51 Me. 264; *Weise v. Smith,* 3 Oreg. 445; *Brown v. Kentfield,* 50 Cal. 129; Gould on Waters, secs. 95, 96; *Dalrymple v. Mead,* 1 Grant's Cas. (Pa.), 197.

The following opinion was filed June 20, 1888:

CASSODAY, J. The general description of the St. Croix river, as given in the answer and above stated, seems to be

verified to some extent by the map. The lower end or
widened part of the river is known as Lake St. Croix. The
city of Stillwater is situated near the upper end of this
lake, on the Minnesota side, and is some thirty miles above
where the lake empties into the Mississippi. It is conceded
that no part of the upper boom, mentioned in the eleventh
section of the charter printed above, located between the
head of Cedar Bend, eighteen miles above Stillwater, and a
place called Rock Island, about ten miles further up the
river, and near Taylor's Falls, was maintained at the time
of this log jam in 1883, but that the same had long before
been wholly abandoned, as authorized by that section of
the charter. The defendant concedes, however, that the
lower boom therein mentioned had long previously been
constructed, and was maintained at the time of the jam;
that the foot of it was about one mile above Stillwater, and
extended up to Titcomb's Landing, about five miles above
Stillwater. It is, moreover, conceded that the defendant
had previously, as authorized by the section, constructed,
and at the time of the jam was maintaining, certain addi-
tional booms between Titcomb's Landing and Marine Mills,
about twelve miles above Stillwater, for the purpose of
holding, controlling, and securing such logs and timber as
might float or be driven down the St. Croix and its tribu-
taries. The foot of such lower boom started near the Min-
nesota shore. Then, after proceeding up the river about
half a mile, it came to the foot of a line of bars or islands
in the river, one above another, along which it followed,
gradually nearing the Wisconsin shore, with an outside
boom, so called, in the Wisconsin channel, until it struck
Four-Mile island, and from thence it continued a mile or
more further up to the upper "trip" at Titcomb's Landing.
For the most of that distance such piling and booms were
near the Wisconsin shore, with an occasional "trip" or
"gap," through which logs or boats might pass to and from

the main channel, which was mostly on the Minnesota side of the river, to what was called the "canal," on the Wisconsin side of the river. On the Minnesota side of the river, and opposite the head of Four-Mile island, was a short boom at the head of Lyman's slough, which had a corresponding bar or island running down the river about a mile. Between Four-Mile island and Titcomb's Landing was Revior's island, about half a mile in length, with a narrow slough of the same name between it and the Minnesota shore. About half a mile above Titcomb's Landing was a "cut-off," on the Wisconsin shore, leading around into one of the outlets of Apple river and Rice lake, and thence into the canal mentioned at the upper "trip." This cut-off, however, was only used in extremely high water. From the head of this cut-off there ran along up the Wisconsin shore the defendant's piling and booms to the entrance of Kelley's slough, opposite the foot of Arcola island, being a distance of about a mile. That slough ran into one of the outlets of Rice lake and Apple river, and thence into the main channel. Just above the head of the cut-off, and in about the middle of the river, was Trask's island, about half a mile in length, with the defendant's piling and booms on the lower east half of it and the upper west half of it. From the head of Trask's island there was a line of the defendant's piling and booms running up near the middle of the river a distance of nearly half a mile, to the foot of Arcola island, and thence for a short distance along the east side of it. That island was narrow, about a quarter of a mile in length, and divided the main channel of the river. Opposite the head of that island, and on the Minnesota shore, was the mouth of Page's slough,— a crooked channel of variable width, and about three or three and a half miles in length, and fed from the main channel. From the head of Arcola island, up the main channel, to the head of Page's slough, was about two and a half or three miles.

On the east of that section of the river, and from six to ten hundred feet from it, was Rice lake, fed from the river near Marine Mills by a narrow and shallow slough. At some places the distance between Page's slough and the main channel was over half a mile. In the spaces between them were Mud lake and Butler lake. From the head of Page's slough to Marine Mills was about a mile. There is evidence tending to show that the defendant's piling extended from the head of Arcola island to the land between the main channel and Page's slough; also at the head of Page's slough.

It is manifest from the charter that the defendant's booms below Titcomb's Landing were for the purposes of storing, assorting, and delivering logs and timber to the respective owners, designated by marks, of which there appear to have been several hundred; while the several additional booms above Titcomb's Landing were for the purpose of holding, controlling, securing, and guiding such logs into such lower booms. It appears from the evidence that, during the season of 1882, commencing May 10, 1882, and finishing September 7, 1882, the defendant ran through and turned out of its booms, near the foot thereof, logs sufficient to make 272,413,460 feet; that of that amount only about 27,500,000 were so turned out prior to June; that on some days it so turned out over 6,000,000 feet. During the season of 1883, commencing April 25, 1883, and ending August 22, 1883, it ran through and turned out of its booms, near the foot thereof, logs sufficient to make 271,374,690 feet, of which over 44,000,000 were so turned out prior to June; that on some days it turned out nearly 5,000,000 feet.

It appears from the evidence that some time in the early part of June, 1883, the defendant's booms below Titcomb's Landing became filled with logs, containing some seventy or eighty millions feet; that the logs continued to come

J. S. Keator Lumber Co. and others vs. The St. Croix Boom Corp,

down the river faster than they were sorted and turned out at the foot of the booms; that, in the forepart of June, the boom from the head of Trask's island to the foot of Arcola island was substantially closed; that when the logs had filled the channel east of Arcola island to the head thereof, and about June 11, 1883, a rope boom was put across to the western shore of the main channel from the head of that island, and thus very largely stopping the passage of logs below; that thereupon the steamboat and barges of Walker, Judd & Veazie, and other water-craft, which had previously passed up and down the main channel above Arcola island, continued their navigation, through Page's slough, to about June 16, 1883, and until the head of the jam in the main channel above Arcola island had reached a point above the head of Page's slough, when all navigation ceased until on or about August 7, 1883. During that time, Walker, Judd & Veazie transferred from their mills at Marine to their boats at Page's slough 840,000 feet of their lumber. The head of the jam continued to move up the river until it reached a point some distance above Vassa, which is four miles above Marine Mills. It is estimated that there were in the jam from one hundred and twenty-five to one hundred and eighty millions feet. Walker, Judd & Veazie had about seventeen millions feet in the jam, of which a drive of about seven millions reached the head of the jam when it was at Marine Mills, and the other ten millions when the head of the jam was near Vassa, about ten days afterwards. From June 1st to the 10th the average output from the defendant's booms, at the foot thereof, was 2,608,250 feet per day, and for the balance of that month 3,260,800 feet per day; and such daily output was greatly increased for the month of July. The average daily output from the defendant's booms in May and June, 1884, was considerably larger than in 1883. There was evidence tending to show that Mud and Butler

lakes, connected with Page's slough, could be improved so as to store several millions feet of logs, especially during a high stage of water, and that the same was true respecting Rice lake. Such is the general nature of the evidence upon which the court granted a nonsuit.

The *gravamen* of the complaint is that the defendant, assuming to proceed under its charter, had wholly obstructed the navigation of the river without authority of law and in violation of the provisions of its charter, and for its failure and refusal to make proper preparations for receiving and assorting logs, and its careless and negligent handling of such logs and its booms. The use of rivers and smaller streams for the floatage of logs is essential to the continued prosperity of the immense lumber and industrial interests of northern Wisconsin. The regulation and preservation of such use, in connection with and as facilitating navigation by reasonable and proper booms and other structures, has long been the legislative policy of this state, as frequently sanctioned by this court. It is true, the constitution of the state declares that "the river Mississippi, and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost, or duty therefor." Sec. 1, art. IX. This provision is taken almost literally from the fourth of the "articles of compact" contained in the ordinance of 1787, and sec. 3 of the enabling act for the admission of the state. In speaking of it in *Wis. R. Imp. Co. v. Manson*, 43 Wis. 261 *et seq.*, the present chief justice said: "Though the language of the constitution is general, it must receive a reasonable construction. It would be most unreasonable to say that it prohibited the state from granting power to a corporation or individual to make a canal or railroad through or across the 'carrying places,' or to construct

works in a stream, at a point where its waters were unnavigable, for improving the navigation, and to charge a reasonable toll as a compensation for the benefit of such improvements." It is then said that the object of this provision " was to prevent the imposition of any tax, impost, or duty for the use of the streams and carrying places in *their natural state*. The constitution relates to *navigable waters only*. It does not deprive the legislature of the power, through the instrumentality of corporations or individuals, to connect unnavigable waters by canals or other means, or to render navigable places in them not navigable by nature, and to charge tolls in such cases for the use of the waters made navigable by such improvements. It is evident that waters may be partially navigable only, either as to time or mode of navigation; and the constitution does not deprive the legislature of the power of making such improvements as increase the navigability of partially navigable waters, either in point of time or mode of navigation, and to charge tolls for the use of waters whose navigability is so increased by such improvements. This, we think, is the true construction of the constitution." The objection to such improvement company taking possession of " the entire channel of the river " is then answered in these words: " It is said that any improvement authorized should require the river to be left in substantially its former state, so as to give the public the option to use the improvement and pay the toll, or the free natural channel. We do not feel the force of this position. . . . The legislature is, primarily at least, the judge of the necessity of the improvement; and when it delegates the power to a corporation, and the state does not question that the improvement made by the corporation is in conformity with the delegated power, it seems to us that neither the necessity nor usefulness of the improvement, nor the manner in which it is made, can be called in question by private parties. Large

discretion was given the plaintiff as to the mode of executing the work, and presumably it has exercised the power conferred wisely. The case involves no question of foreign or interstate commerce, or of the paramount authority of Congress over the public navigable waters of the United States. . . . Until Congress exercises its power over the subject, the improvement legalized by the state cannot be called in question by private parties." In support of these propositions the opinion cites *Pound v. Turck*, 95 U. S. 459.

These several propositions are in harmony with subsequent adjudications in this court. *Stevens Point Boom Co. v. Reilly*, 44 Wis. 295, 46 Wis. 237; *Cohn v. Wausau Boom Co.* 47 Wis. 314; *Borchardt v. Wausau Boom Co.* 54 Wis. 107; *Black River F. D. Asso. v. Ketchum*, 54 Wis. 313; *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 659; *Edwards v. Wausau Boom Co.* 67 Wis. 463. The same propositions are also sanctioned by numerous cases in the supreme court of the United States, in addition to *Pound v. Turck, supra*. See *Withers v. Buckley*, 20 How. 84; *Escanaba Co. v. Chicago*, 107 U. S. 678; *Huse v. Glover*, 119 U. S. 543; *Ouachita Packet Co. v. Aiken*, 121 U. S. 444; *Sands v. Manistee R. Imp. Co.* 123 U. S. 288. In *Cohn v. Wausau Boom Co., supra*, it was said by RYAN, C. J., that " it is settled in this state that a riparian owner on navigable water may construct, in front of his land, in shoal water, proper wharves, piers, and booms, in aid of navigation, at his peril of obstructing it, far enough to reach actually navigable water. This is properly a riparian right, resting *on title to the bank,* and not upon *title to the soil under the water.* It is a *private* right, however, *resting,* in the absence of prohibition, *upon a passive or implied license by the public; is subordinate to the public use, and may be regulated or prohibited by law.*" 47 Wis. 322. Then, after construing the company's charter as giving the *exclusive*

right of constructing booms for holding, storing, and assorting logs for a certain distance up and down the river, and works in the water in aid thereof, but without authorizing the use of any of the river's banks owned by other parties, it was, in effect, held that as the chief value of the river was for the floatage of logs to market, and such booms were necessary therefor, and as the company's charter gave an equal right in the use of such works to all the world, the defendant should be held to be a *quasi* public corporation, with franchises for a public use; and that the prohibition of other riparian owners on the same river, within such limits, from constructing other booms therein, was a valid exercise of a paramount public right. *Ibid.*

Among the authorities cited in the opinion in support of such exclusive right is *Pound v. Turck, supra.* That was an action in the circuit court of the United States for damages in the delay of a raft of lumber, etc., by reason of booms, piers, and dams constructed entirely across the Chippewa river by legislative authority from this state, and in such a manner as to constitute material obstructions to the navigation of the same by any species of water-craft. The judgment of the trial court was reversed because that court had charged the jury, in effect, "that if the structures of the defendants were a material obstruction to the general navigation of the river, the statute of the state afforded them no defense, though they were built in strict conformity to its provisions." 95 U. S. 462. This was, in effect, put upon the ground that conceding that the Chippewa, though small, was a navigable river and protected by the commercial clause of the constitution of the United States, yet that it was not of such a nature as to give Congress exclusive jurisdiction, and, until Congress should intervene by appropriate legislation, the matter of navigation was subject to the control of the legislature of the state. In sup-

port of this position, the opinion cites adjudications of that court sanctioning the validity of state legislation authorizing dams and bridges across navigable streams in a manner to wholly or partially obstruct navigation.  *Willson v. Black Bird C. M. Co.* 2 Pet. 245; *Gilman v. Philadelphia,* 3 Wall. 713.

The decision of *Pound v. Turck, supra,* has frequently been approved by the supreme court of the United States. *Escanaba Co. v. Chicago,* 107 U. S. 686; *Cardwell v. American Bridge Co.* 113 U. S. 210, 211; *Willamette Iron Bridge Co. v. Hatch,* 125 U. S. 8.  In *Cardwell v. American Bridge Co., supra,* Mr. Justice FIELD, construing the act admitting California into the Union and guarantying the free navigation of its waters as public highways substantially in the language of our state constitution above quoted, said: " The act enabling the people of Wisconsin territory to form a constitution, and for admission into the Union, contains a similar clause. And yet in *Pound v. Turck,* . . . it was held that a statute of that state which authorized the erection of a dam across a navigable river within her limits was not unconstitutional, in the absence of other legislation by Congress bearing on the case.  The court does not seem to have considered the question as affected by the clause in the enabling act.  That clause is not, it is true, commented on in the opinion; but the section containing it is referred to, and the declaration that navigable streams within the state are to be common highways must have been in the mind of the court. . . .  The clause, therefore, in the act admitting California, . . .  must be considered, according to these decisions, as in no way impairing the power which the state could exercise over the subject if the clause had no existence."  He then, in effect, construes the clause as insuring " a highway equally open to all, without preference to any, and unobstructed by duties or tolls, and thus

prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of any toll for their navigation."

In the more recent case of *Hamilton v. V., S. & P. R. Co.* 119 U. S. 280, the company was chartered by the state of Louisiana to build its railroad from a point opposite Vicksburg to the Texas line. In doing so, it constructed a bridge, with a draw, over the Bouff river, which was navigated by the plaintiff's steamer, for about six months each year, from a point several miles above to the Mississippi river. The decay of the bridge necessitated a reconstruction, which was done at a time least likely to interfere with such navigation. By reason of unexpected rains, the river became navigable for such steamer earlier than usual; but by reason of temporary obstruction, necessitated by building the bridge, the same was wholly prevented for six weeks, and the action was brought to recover damages therefor. The company justified under such state legislation, and on the ground that its action was necessary and performed with reasonable care. The plaintiff claimed that such state legislation was void by reason of the clause in the enabling act and act for the admission of Louisiana, guarantying the free navigation of such river substantially like that quoted from our state constitution. The state court held that the obstruction, under the circumstances, was *damnum absque injuria,* and, following the cases cited, such judgment was affirmed by the supreme court of the United States on writ of error. Among other things, Mr. Justice FIELD, speaking for the whole court, said: "Until Congress intervenes in such cases, and exercises its authority, the power of the states is plenary." Then, after stating that no specific directions as to the form and character of such bridges were prescribed in the charter, he said: "The authority of the company to construct them was only an implied one, from the fact that such structures were essen-

tial to the continuous connection of the line. Two condi-
tions, however, must be deemed to be embraced within this
implied power; one, that the bridges should be so con-
structed as to insure safety to the crossing of the trains,
and be so kept at all times; and the other that they should
not interfere *unnecessarily* with the navigation of the
streams."

In the very recent case of *Willamette Iron Bridge Co. v.
Hatch*, 125 U. S. 9 *et seq.*, Mr. Justice BRADLEY, speaking for
the whole court as to the construction to be given to sub-
stantially the same clause here involved, said: "In admit-
ting some of the new states, however, the clause in ques-
tion has been inserted in the law, as it was in the case of
Oregon, whether the state was carved out of the Territory
Northwest of the Ohio or not; and it has been supposed
that, in this new form of enactment, it might be regarded
as a regulation of commerce which Congress has the right
to impose.  .  .  .  Conceding this to be the correct view,
the question then arises, What is its fair construction?
What regulation of commerce does it affect? Does it pro-
hibit physical obstructions and impediments to the naviga-
tion of the streams, or does it prohibit only the imposition
of duties for the use of the navigation, and any discrimina-
tion denying to citizens of other states the equal right to
such use? This question has been before this court, and
has been decided in favor of the latter construction. It is
obvious that, if the clause in question does prohibit physical
obstructions and impediments in navigable waters, the state
legislature itself, in a state where the clause is in force,
would not have the power to cause or authorize such ob-
structions to be made without the consent of Congress. But
it is well settled that the legislatures of such states do have
the same power to authorize the erection of bridges, dams,
etc., in and upon the navigable waters wholly within their
limits, as have the original states, in reference to which no

such clause exists." In support of such positions he cites the cases above mentioned, and adds: "It is clear, therefore, that, according to the construction given by this court to the clause in the act of Congress relied upon by the court below, it does not refer to physical obstructions, but to political regulations which would hamper the freedom of commerce. It is to be remembered that, in its original form [as in our state constitution], the clause embraced *carrying places between the rivers*, as well as the rivers themselves; and it cannot be supposed that those carrying places were intended to be always kept up as such." He then indicates that some of those places are now covered by populous towns or otherwise occupied, and that the clause there in question did not establish the police power of the United States over the rivers of Oregon.

The supreme court of Minnesota, under a constitutional provision like our own, has reached the same conclusion; and, in support of it, cites *Pound v. Turck, supra*, the decisions from this state above mentioned, and also cases from Michigan. *Osborne v. Knife Falls Boom Corp.* 32 Minn. 412. The same was held in *Craig v. Kline*, 65 Pa. St. 399, notwithstanding the existing agreement between Maryland and Pennsylvania for the preservation of the free and public navigation of the Susquehanna river. *Duluth Lumber Co. v. St. Louis Boom & Imp. Co.* 17 Fed. Rep. 419.

Obviously, the conclusions thus reached are in conflict with some things said by my brother TAYLOR in *Sweeney v. C., M. & St. P. R. Co.* 60 Wis. 67 *et seq.*, as to obstructions in navigable rivers which the legislature could not authorize should they make the attempt; but the question thus suggested was not there involved, and the absolute right of authorizing the *permanent* obstruction of such rivers is not here involved. The right to authorize booms for the interception, storage, and handling of logs in a manner to materially interfere with the navigation by steam-

boats and other water-craft, however, is involved, and such right is not only sanctioned by the supreme court of the United States, but by numerous adjudications of this court.

2. The obstructions here complained of were in that part of the St. Croix river constituting the boundary line between this state and Minnesota. The defendant justifies under corporate authority derived solely from Minnesota. We are here confronted with the question whether such authority, so granted by that state alone and without the concurrence of this, is of any validity. Our constitution declares that "the state shall have *concurrent jurisdiction* on all rivers and lakes bordering on this state, so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed and bounded by the same." Sec. 1, art. IX, Const. Wis. This provision is substantially the same as the third section of the act of Congress of August 6, 1846, enabling the organization of this state preparatory to its admission into the Union. Substantially the same provision, as applied to Minnesota, is found in sec. 2 of art. II of the constitution of that state, which is in substance the same as sec. 2 of the enabling act for the organization of that state passed by Congress in 1857. Such "concurrent jurisdiction," therefore, is fairly established by the combined action of the general government and each of these two states. Its significance is the important inquiry presented. No one will deny that the one state has as much jurisdiction over the commerce of the river as the other, nor that the jurisdiction of each and both must be and remain subordinate to any action of Congress, under the commercial clause of our national constitution. The question recurs whether one of these states, without the concurrence of the other, can legally grant the booming privileges and rights authorized by the defendant's charter.

The gravity of the question cannot well be overestimated.

The commerce of the northwest is rapidly increasing. Perhaps over 500 miles of the boundary line of this state is made up of navigable rivers. Jurisdiction claimed under the authority of the one state to-day may be asserted under the authority of the other to-morrow. Jurisdiction denied in the one state this year may be assumed by the same state next year. It is important to the people of this state, as well as such adjoining states, therefore, that the question suggested should be carefully considered, and then determined in strict accordance with the established law, and, as far as may be, in harmony with the decisions of the supreme court of the United States, which are, of course, binding on all questions of interstate commerce. But we are referred to no case in that court, and we find none, covering the precise question here presented. We do find, however, numerous adjudications in that court involving the right of one state to interfere with the navigation of the waters of a river constituting the boundary line between it and another state. Some of these cases may be instructive here.

It seems to be well settled in that court, as well as others, that the shores of navigable waters, and the soils under them, were not granted to the United States, but were, with the right of eminent domain over them for all municipal purposes, reserved to the states, respectively; and this applies to the new states as well as the original states. *Pollard's Lessee v. Hagan*, 3 How. 230; *Gilman v. Philadelphia*, 3 Wall. 726; *Stockton v. B. & N. Y. R. Co.* 32 Fed. Rep. 9.

Among the cases demanding consideration is *Pennsylvania v. Wheeling & B. Bridge Co.* 9 How. 647, 13 How. 518, and 18 How. 421. The free navigation of the Ohio river had been secured to all by the compact in the ordinance of 1787 and the action of Virginia, from which the Northwest Territory was acquired. The same was reaffirmed, upon the admission of Kentucky, by compact between that state,

Virginia, and the United States. It appears that Virginia and Ohio favored the construction of such bridge, while Pennsylvania opposed it, in consequence of its then prospective interference with the interstate commerce of that state upon the river, in connection with its canals and railroads. For a time, Congress refused to take any direct action in the matter. In 1847 the state of Virginia authorized its construction. A state being complainant, the supreme court of the United States took original jurisdiction of the suit to restrain the construction of the bridge and to abate the same. Upon the hearing the majority of the court concluded that the construction of the bridge, on the plan proposed, would interfere with such commerce, and it was therefore decreed that the complainant be entitled to such injunction and abatement, unless the plans should be changed, as indicated therein, so as to obviate such interference, in which event the company were at liberty to complete the bridge. 13 How. 578, 612, 622–627. This was necessarily on the theory that Virginia had power and jurisdiction to authorize such structure, provided it did so in a way not to intrude upon the power exclusively vested in Congress by the commercial clause of the constitution. After that decree had been entered, and August 31, 1852, Congress passed an act declaring the bridge to be a lawful structure as then constructed, and requiring all vessels and boats navigating the river to regulate their height accordingly. 18 How. 421, 429. That act was held to be constitutional, and not invalid by reason of such compact. *Ibid.* In that case it was said, in the prevailing opinion of the court on the last hearing, that "the bridge had been constructed under an act of the legislature of the state of Virginia; and it was admitted that act conferred full authority upon the defendants for the erection, *subject only to the power of Congress* in the regulation of commerce." Id. 430. This language has received recent

sanction from the same court. *Bridge Co. v. U. S.* 105 U. S. 480, 493, 494, 497; *Willamette Iron Bridge Co. v. Hatch*, 125 U. S. 15. It must be conceded, however, that the power and jurisdiction of Virginia over the half of the river most distant from it was greater than it otherwise would have been, by reason of the terms and conditions upon which it parted with its title to the Territory Northwest of the Ohio. *Handly's Lessee v. Anthony*, 5 Wheat. 374; *Howard v. Ingersoll*, 13 How. 381; *Alabama v. Georgia*, 23 How. 505.

In *Bridge Co. v. U. S., supra*, Kentucky and Ohio each chartered and authorized a company to build a bridge over the river at Cincinnati, and the same was built by a consolidation of the two companies.

In *Mississippi & Missouri R. Co. v. Ward*, 2 Black, 485, Ward, as owner and navigator of steamboats from St. Paul to St. Louis, filed a bill in equity, in the United States court for Iowa, for the abatement of the company's bridge across the Mississippi at Rock Island. The river at that point was 1,410 feet wide, and the bridge 1,570 feet long, with six piers, three of which were on the Iowa side. The draw-pier was the fourth from the Iowa shore, and was 386 feet long and 45 feet wide. The draw-space on the Iowa side was 111 feet, and on the Illinois side 116 feet, in the clear. The Illinois draw-passage was directly over the deepest channel of the river, and directly over the usual track of steamboats before the building of the bridge. That draw-passage of 116 feet, the 45 feet of the draw-pier, and 80 feet between it and the eastern line of Iowa, which was the middle of the river, covered a space of 241 feet of water-way, and embraced the main channel, where steamboats had at all times navigated prior to the bridge. It was at the drawpier, and in the Illinois draw-space, that the complainant's boats sustained the injury which was the foundation of the action. The trial court ordered the removal of the three spans and piers on the Iowa side. That decree was reversed

on appeal, and the complaint dismissed. In doing so, it was held, in effect, that the piers and the portions of the bridge on the Illinois side were, at most, an offense against the laws of Illinois, of which neither the trial court nor the state court of Iowa had jurisdiction; that, inasmuch as the removal of the three spans and piers on the Iowa side would destroy the bridge, without materially improving the navigation of the river, it did not call for equitable interference, and hence was improperly ordered; that the public were not entitled to the free navigation of the *whole river from bank to bank*, as that would prevent the building of any lawful bridge whatever, but only a free and unobstructed navigable channel of the river. The bridge appears to have been built under corporate authority granted by Illinois, with the sanction or permission of Iowa. It should be observed that sec. 2 of the enabling act for Illinois conferred upon that state "concurrent jurisdiction on the Mississippi river with any state or states to be formed west thereof, so far as said river" should "form a common boundary to both;" but we find no similar clause relating to Iowa in its constitution or otherwise.

The supreme court of the United States has, in effect, frequently held that where two states are divided by a navigable river one of them alone may, in the absence of Congressional regulation, legally authorize the construction of wharves, piers, and other structures on its side of the river, in aid of navigation, and the exaction of pay for the use of the same from those navigating such river. *Packet Co. v. Keokuk*, 95 U. S. 80; *Packet Co. v. St. Louis*, 100 U. S. 423; *Vicksburg v. Tobin*, 100 U. S. 430; *Packet Co. v. Catlettsburg*, 105 U. S. 559; *Transportation Co. v. Parkersburg*, 107 U. S. 698–701. Such exaction, however, must be confined to a reasonable compensation for such use, but can not be legally imposed as a tax or burden upon interstate commerce. *Ibid.; Guy v. Baltimore*, 100 U. S. 434; *Trans-*

*portation Co. v. Parkersburg, supra.* The distinction was, perhaps, first aptly stated by Mr. Justice CURTIS, in these words: "The grant of commercial power to Congress does not contain any terms which expressly exclude the states from exercising an authority over its subject matter. If they are excluded, it must be because the nature of the power thus granted to Congress requires that a similar authority should not exist in the states. . . . Now, the power to regulate commerce embraces a vast field, containing not only many but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every part, and some, like the subject now in question [pilotage], as imperatively demanding that diversity which alone can meet the local necessities of navigation. . . . Whatever subjects of this power are in their nature national may justly be said to be of such a nature as to require exclusive legislation by Congress. That this cannot be affirmed of laws for the regulation of pilots and pilotage is plain." *Cooley v. Board of Wardens,* 12 How. 318, 319. This distinction has since been frequently sanctioned, and has been applied to wharfage on such dividing rivers. *Transportation Co. v. Parkersburg,* 107 U. S. 701–704; *County of Mobile v. Kimball,* 102 U. S. 701. In *Atlee v. Packet Co.* 21 Wall. 389, the pier against which the company's barge struck constituted a part of the riparian owner's boom to retain logs for his mill, and the same was located 140 feet from the shore, and in water of the average depth of twelve feet, *and was constructed without any legislative authority whatever;* and hence the case is distinguishable.

So it has been settled by the same court that one of two states separated by a navigable river may, in the exercise of its police power, grant exclusive authority to one of its citizens, as against others, to run a ferry across such river,

and the exaction of fare for its use, without infringing the commercial clause of the federal constitution, and without the sanction of such other state. *Conway v. Taylor's Ex'r*, 1 Black, 603; *Fanning v. Gregoire*, 16 How. 524; *Wiggins Ferry Co. v. East St. Louis*, 107 U. S. 365; *Gloucester Ferry Co. v. Pennsylvania*, 114 U. S. 196; Gould on Waters, § 35. Of course, this would be subject to the exercise of a similar power by such other state. *Ibid.* In *Conway v. Taylor's Ex'r, supra*, it was said by the court: "It is insisted that such a franchise, when confined to one shore, is a nullity, and that the concurrent action of both states is necessary to give it validity. . . . The concurrent action of the two states was not necessary." 1 Black, 629. "The franchise is confined to the transit from the shore of the state. The same rights which she (Kentucky) claims for herself she concedes to others. She has thrown no obstacle in the way of the transit from the states lying upon the other side of the Ohio and Mississippi. She has left that to be wholly regulated by their ferry laws. We have heard of no hostile legislation and of no complaints by any of those states. It was shown in the argument at bar that similar laws exist in most, if not all, the states bordering upon those streams. They exist in other states of the Union bounded by navigable waters." Id. 631.

The defendant was authorized, by its charter, to construct its booms upon the St. Croix river, and, for that purpose, to enter upon and occupy any land necessary for properly conducting its business. Secs. 11, 21, *supra*. It does not in terms give such authority upon the lands or waters of Wisconsin. Since the charter was granted by Minnesota alone, the defendant's authority to so enter upon and occupy would seem to be confined to the territory of Minnesota, and in no event to reach beyond its jurisdiction. The line between the two states, at the points in question, is "the main channel of" the St. Croix. Sec. 1, art. II,

Const. Wis.; sec. 1, art. II, Const. Minn. The defendant was required by its charter at all times to "give free passage to all rafts, steamboats, keel-boats, or other water-craft navigating the said river St. Croix, without any hinderance or delay by reason of said booms or the logs therein confined," unless it was impossible to prevent such obstruction by reason of an unusual press or jam of logs. Sec. 18. The authority of Minnesota alone to grant such a charter seems to be fairly deducible from the several adjudications cited, unless she is deprived of doing so by that clause of her constitution and ours, and the enabling acts mentioned, securing to each state "concurrent jurisdiction" on that river.

3. Are the words "concurrent jurisdiction," as thus used, to be construed as requiring the joint action of both states to give validity to such a charter, or could Minnesota do so alone, with the corresponding right in Wisconsin to grant a similar charter? If such joint action was necessary to give such validity, then the refusal or mere failure of the one state to so act would wholly prevent the exercise of any jurisdiction by either state. "Concurrent jurisdiction" are words usually applied to two or more courts. When so applied, no one has ever pretended that the exercise of such jurisdiction by the one court was dependent upon its concurrent exercise by any other court. On the contrary, all recognize the authority of each such tribunal to deal with the same subject matter, at the choice of the suitor. This is illustrated by the jurisdiction of state and federal courts in the same territory, as to controversies between citizens of different states and also as to other matters. They never concur in each other's actions, but each proceeds separately and independently of the other. The same is true respecting offenses and torts committed upon a river dividing two states, where the courts of each have jurisdiction of the same; for in such case each court must necessarily act separately and independently of the other. Such jurisdiction

of the courts of the respective states, when concurrent, extends to the whole of that portion of the river dividing them. *State v. Plants*, 25 W. Va. 119, 52 Am. Rep. 211; *Carlisle v. State*, 32 Ind. 55. Although the words " concurrent jurisdiction " and " jurisdiction " are usually applied to the rightful authority of courts, yet they are not limited to such use. On the contrary, they are broad enough to embrace also the exercise of both legislative and executive powers. *Kendall v. U. S.* 12 Pet. 623; *Sherlock v. Alling*, 44 Ind. 184. Thus it is said in the case last cited " that this state [Indiana] possesses concurrent jurisdiction with the state of Kentucky on the river at the place where the cause of action, if any, arose. The jurisdiction may be exercised in such manner as the state shall elect. It was exercised in unmistakable language in the constitution, by declaring that the state possesses such concurrent jurisdiction, in civil and criminal cases, with the state of Kentucky. The jurisdiction which the state possesses is not limited to the service of process. It is general, and includes the right of legislation touching all civil and criminal cases on the river. . . . The jurisdiction asserted by the constitution is not limited to judicial proceedings in civil and criminal cases. It is such as the state may choose to exercise touching such actions, and legislation is included." The three co-ordinate branches of the state government must, necessarily, in their respective spheres, possess powers which are co-extensive with each other. *Worcester v. Georgia*, 6 Pet. 570.

The words " concurrent jurisdiction " must have been used, in the compact between the federal government, Wisconsin, and Minnesota, in the sense in which they had previously been used and were generally understood. When, therefore, by such compact it was in effect provided that each such state shall have " concurrent jurisdiction " on that portion of the river St. Croix constituting the boundary line between them, it included the exercise of such legislative

powers by each state over the whole river as were consist-
ent with the exercise of similar powers over the same por-
tions of the river by the other state. In other words, by
such compact each state secured to itself such "concurrent
jurisdiction" upon the half of the river within the terri-
torial limits of the other state, by reducing what would
otherwise have been its exclusive jurisdiction upon its own
half to mere "concurrent jurisdiction." The result is that
neither of these states could, *as against the other*, rightfully
assume, or authorize the assumption of, permanent and ex-
clusive occupancy, possession, and control of the entire
navigable portions of the river. *President, Managers, etc.
v. Trenton City Bridge Co.* 13 N. J. Eq. 46; *Att'y Gen. v.
D. & B. B. R. Co.* 27 N. J. Eq 631. Of course, no two
structures or bodies can occupy precisely the same space at
the same time upon a river, any more than elsewhere.
Nevertheless, either state may, in aid of navigation, as-
sume, or authorize the assumption of, reasonable occupancy,
possession, and control of portions of such navigable waters,
provided the same is reasonably consistent with similar oc-
cupancy, possession, and control which may be assumed or
authorized by such other state. Concurrent jurisdiction, to
be of value to the respective states or to any one, must
have a practical application. Such application should, more-
over, be consistent with the reasonable continuance of a
navigable channel as a public highway between such states,
and must necessarily remain subject to any regulation of
commerce by Congress under the commercial clause of the
federal constitution.

Here large portions of the defendant's booms were upon
this side of the river, and between the main channel and
the Wisconsin shore. It may be, as contended, that the de-
fendant's charter grants or purports to grant authority, or,
at least, that the defendant, under it, has assumed to exer-
cise authority which transcends the rightful powers of

Minnesota, and infringes the concurrent jurisdiction of Wisconsin. Assuming such to be the case, and the question recurs whether such excess of rightful jurisdiction is available to the plaintiffs. In *Rundle v. D. & R. Canal Co.* 14 How. 80, the plaintiffs owned certain mills in Pennsylvania, opposite Trenton, N. J., supplied with water from a dam in the Delaware river, by a title running back prior to 1771. In that year the two provinces, which subsequently became the states of Pennsylvania and New Jersey, respect.vely passed acts declaring the river a common highway for the purposes of navigation, and appointed commissioners with full power to improve such navigation and remove any obstructions. By compact in 1783 it was agreed by the two states that the river should continue to be and remain a common highway in its whole length and breadth, equally free and open for the use, benefit, and advantage of each of the two states. The defendant company was incorporated under the laws of New Jersey in 1830, and was thereby authorized to and did construct a canal in that state, with a feeder from a dam in that river above the plaintiffs'. The action was brought by reason of the diversion of such water, to the damage of the plaintiffs. The court held, in effect, that the plaintiffs had no grant of the usufruct of the waters of the river, but only a license to draw from their dam; that such license was revocable and in subjection to the superior right of the state to divert the water for public improvements, either by the state directly or by a corporation created for that purpose; that the plaintiffs, being but tenants at sufferance in the usufruct of the water of the two states, who owned the river as tenants in common, were not in a condition to question the relative rights of either state to use its waters without the consent of the other; that as, by the laws of their own state, the plaintiffs could have had no remedy against a corporation authorized to take the whole waters of the river for the purpose of

canals or improving the navigation, so they could not sustain a suit against a corporation created by New Jersey for the same purpose, which had taken a part of the waters. The principle of that decision seems to be that a mere private party should not be heard to complain that one of two states, divided by such river, had invaded the rightful jurisdiction of the other, by diverting more than its share of the waters. So here, we think the plaintiffs are not entitled to be heard as to whether Minnesota has infringed the rightful jurisdiction of Wisconsin. This state is not a party to this suit, and her comparative rights in and upon the waters of the river at the points in question cannot be adjudicated in this action. Whether such a controversy would be most properly determinable in the courts of either state or of the United States (as in *Wisconsin v. Duluth,* 96 U. S. 379; *South Carolina v. Georgia,* 93 U. S. 4; *Alabama v. Georgia,* 23 How. 505), we are not here called upon to decide. It is enough to know that such non-exercise of jurisdiction by the one state is not available as a substantive cause of action against a corporation created by and acting under the authority of the other state.

4. The defendant is certainly not liable for its failure to go outside of the scope of its charter and invade the territory of Wisconsin by taking possession of Rice lake, and placing booms therein, and constructing the necessary inlet and outlet for the proper storage of all logs that may have been adrift in the river.

5. The liability of the defendant, if any, must arise out of its failure to perform some of the duties imposed by its charter, or the careless or negligent manner in which it performed such duties. These questions we are unable to solve as mere matters of law. The record, as indicated, presents too many disputed facts and circumstances and too many disputed inferences to be drawn from admitted facts to authorize us in saying that the case was properly taken

from the jury and determined as a matter of law. Of course, the defendant was, under no view of the case, liable for any remote and speculative damages. It was, however, bound to the faithful performance of the duties imposed by the charter as to such lower booms and additional booms in aid thereof. They did not extend above Marine Mills. Whether, below that point, the capacity of the defendant's works and booms might, with reasonable precautions and diligence, have been increased by improving Mud and Butler lakes, or otherwise, were necessarily questions of fact, which we are not at liberty to say were conclusively negatived. The defendant was required, so far as it could with reasonable diligence, by such works and booms, to supply the ordinary demand of the log-driving business on the river, as measured by such use in previous years. In case of pressure of logs from above, it was, moreover, bound to exercise reasonable diligence, under all the circumstances, in delivering logs, and thus relieving its booms at the foot thereof, and thus increase its capacity for receiving logs the more rapidly at the upper end of such lower boom. There is evidence tending to show that the rapidity of such delivery was considerably less at about the time of the commencement of the jam in 1883 than it was a short time before or a short time afterwards, and that it was much less at that time that year than in other years. But the defendant was not bound to go beyond its capacity under its charter, and at all times keep open a navigable channel for steamboats and other water-craft, however unusual or extraordinary might be the press or jam, from above, of logs and timber in the river.

It is claimed that in June, 1883, the river, at the points in question, was unusually crowded with logs coming from all the tributaries above simultaneously and to such an extent as to make it impossible for the defendant to assort and deliver them as fast as they came. This may be so;

J. S. Keator Lumber Co. and others vs. The St. Croix Boom Corp.

and it may be that the defendant was not in fault.   Its liability, if any, must rest upon its failure to perform, or its negligent or careless performance of, some *duty* imposed by its charter, but can never be based upon a condition of things produced by natural causes and the action of others, and which, under its charter, it had no means of preventing. It is to be remembered that the defendant is not a log-driving corporation, but one of the character indicated, and in aid of navigation.   It could not rightfully, by its booms, unnecessarily interfere with the navigation of steamboats and other water-craft; but it had the right to intercept, store, and deliver logs adrift in the river, as indicated by the authorities cited.   In some states they have gone so far as to forbid the floating of logs in such navigable rivers without their being rafted or inclosed in boats and under the control of men actually upon them.   *Craig v. Kline*, 65 Pa. St. 399.   This is on the theory that such uncontrolled floatage is necessarily destructive, more or less, of any other navigation upon the river while it continues.   Thus far, it would seem, Minnesota and Wisconsin have allowed logs above the defendant's works to go promiscuously adrift, regardless of the consequences to other navigators and interests upon the river.   Certainly, a booming corporation, created in the interest of the public as well as log-owners, for the very purpose of bringing order out of the necessary confusion thus produced, should not be held responsible for what it has no capacity nor corporate power to prevent, but only for its failure to perform its duty, or its negligence or carelessness in such performance.   Since there must be a new trial, further discussion is unnecessary.

6. There seems to be no serious controversy but what the plaintiffs have succeeded to the alleged claim for damages accruing to Walker, Judd & Veazie, as against everybody, unless it be their creditors; and there is no claim that the defendant is such.

J. S. Keator Lumber Co. and others vs. The St. Croix Boom Corp.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

ORTON, J.    I most respectfully dissent from the doctrine of the opinion, as I understand it, that the state of Minnesota, in the exercise of her concurrent jurisdiction with this state over the boundary river of St. Croix, may authorize the defendant, as a mere private corporation, to construct such works for booming purposes within that part of the river which lies within her boundary, to the hinderance or obstruction of the navigation of said river to any extent whatever, as a mere act of sovereignty, without the actual concurrence of this state, except as such corporation may be a riparian proprietor of the Minnesota shore of said river contiguous to, and, to the extent of, such works. I think it appears that the defendant is such riparian proprietor.    In such case I agree that the unnecessary and unreasonable obstruction of said river in this case is a question of fact for a jury.    I cannot assent to the meaning of concurrent jurisdiction of the two states over said river as expressed in the opinion.    It makes such jurisdiction independent in each state, rather than concurrent in both.

The respondent moved for a rehearing, urging that there was no evidence tending to show that it was guilty of negligence in the discharge of the duties imposed upon it by its charter which should have been submitted to the jury.

The motion was denied September 18, 1888.