## Meyler v. Wedding.

APPEAL FROM WARREN CIRCUIT COURT.

SEPARATE CONCURRING OPINION BY JUDGE DuRELLE.

In my view, there are other reasons for the decision rendered in this case than those stated in the opinion. I shall state them in as brief a manner, and as little encumbered by citation of authority as possible.

The question presented is, whether process from a court of Indiana may be served upon the Ohio river south of low-water mark. The settlement of this question depends upon the construction given to the peculiar phraseology of section 11 of the compact between Kentucky and Virginia, 13 Hen. St. Va., 19. That provision is:

"Seventh, that the use and navigation of the river Ohio, so far as the territory of the proposed State, or the ter-

ritory which shall remain within the limits of this Commonwealth lies thereon, shall be free and common to the citizens of the United States, and the respective jurisdictions of this Commonwealth, and of the proposed State, on the river as aforesaid, shall be concurrent only with the States which may possess the opposite shores of the said river."

This can not be a grant to any State upon the northern shore of the river, for no such State existed. There was no being *in esse* answering the description to take such a gift. But if it be the proper construction that, by this provision, a trust was created for the benefit of a State thereafter to be created upon the northern shore, and by this language Kentucky was made trustee to hold the title until such creation, it may be that the contention of appellees may be sustained.

But in construing this section it should be borne in mind that it was one part only of the legislation and action whereby Virginia disposed of her imperial domain. And it must be construed as being *in pari materia* with the resolution of the Virginia Legislature relating to the cession of the Northwest Territory, the deed of cession, the ordinance of 1787 by Congress accepting the grant, the amendment of the deed of cession at the request of Congress, and the acts of Congress admitting Kentucky, Indiana, Illinois and Ohio into the Union as States. In none of these statutes or deeds is there to be found any language indicating the slightest intention on the part of Virginia to grant, or the faintest idea upon the part of the General Government that it obtained for itself or any other body politic, any jurisdiction, concurrent or otherwise, over the Ohio river south of low-water mark.

When Virginia granted to the General Government the

Meyler v. Wedding.

territory northwest of the river, it retained the territory as far as low-water mark on the northern side, and consequently retained all jurisdiction to that boundary, for jurisdiction follows boundary. By the compact, the soil as far as that boundary was ceded to Kentucky, and jurisdiction as far as that boundary went with the grant of the territory, except in so far as jurisdiction may have been reserved in the grant. The compact was approved December 18, 1789, by both States. By laws enacted in 1791-92, Kentucky was admitted into the Union as a State, according to the provisions of the compact. By the terms of the grant, which were simultaneously accepted by the grantee, it was provided, first, that the navigation of the river, so far as the territory of the proposed State or the territory remaining within the limits of the grantor lies thereon, shall be free and common to the citizens of the United States; and, second, that the respective jurisdictions of Virginia and Kentucky on the river should be concurrent only with the States which may possess the opposite shores of said river. This does not mean at all the same thing as a provision that the jurisdictions should be only concurrent with such States. That would be a limitation upon the jurisdiction which Kentucky acquired by the compact. The language used is a stipulation that no other body politic, except those States possessing opposite shores, should be permitted to have concurrent jurisdiction with Kentucky over the river. It was an agreement that the General Government, to which the Northwest Territory had just been ceded, should not have, in exercising territorial government over that domain. concurrent jurisdiction with Kentucky over the river. The jurisdiction was to be concurrent only with such States as might thereafter possess the opposite shores.

This was not a limitation upon Kentucky's jurisdiction. It was an inhibition against parting with it. It gave the territory, and with it the jurisdiction, to low-water mark on the northern shore. And it provided that Kentucky should not cede concurrent jurisdiction over the river to the United States, exercising territorial government over the Northwest Territory, or to any other State than those which might possess the opposite shore.

Where, then, do the States to the north of the Ohio obtain jurisdiction, if this construction of the compact be correct? Jurisdiction by one sovereign over territory admitted to be the property and within the boundary of another, is not to be lightly implied, and surely not from language so vague and uncertain as that used in the compact upon this point.

The Congress of the United States has invariably, in its action, recognized this construction as correct.

In 1802, Ohio was admitted as a State, and its boundary fixed at the Ohio river. No concurrent jurisdiction was granted, and of course no territory extending over the river, for the General Government had no territory extending over the river. In 1816, Indiana was admitted. The boundary of its territory was fixed on the west at the middle of the Wabash river, and on the south by the Ohio river. And it was further provided, "that the said State shall have concurrent jurisdiction on the river Wabash with the State to be formed west thereof, so far as the said river shall form a common boundary to both." But no grant is found here of concurrent jurisdiction over the Ohio. In 1818, Illinois was admitted, and its territory bounded by the middle of the Wabash river, the middle of the Mississippi river, and the Ohio river. These acts show that the Federal Government did not assume that the three States to the north had concurrent jurisdiction with

the State of Kentucky over the Ohio. In 1820, Virginia
declared the Ohio river lying opposite her was to be con-
sidered as comprehended within the bodies of several of
her counties, subject to the provisions of the compact
with Kentucky. (Code of Virginia, p. 50.) Ten years be-
fore, Kentucky had enacted a statute to the same effect.
If the Federal Government had concurrent jurisdiction,
it did not surrender it by the act which admitted Indiana
as a State. That State derived its whole existence from
the Federal Government, and can claim no right from
any other source. Kentucky could not, by a compact with
Indiana, grant concurrent jurisdiction without the consent
of the General Government.

Ohio has never adopted any legislation claiming con-
current jurisdiction over the river, nor has such jurisdic-
tion ever been expressly asserted by its courts. So with
Illinois, which has never claimed jurisdiction until the
Constitution of 1848, if then. The Constitution of 1818
fixed the boundaries according to the act admitting the
State into the Union, but in the Constitution of 1848 it
is provided:

"This State shall exercise such jurisdiction upon the
Ohio as she is now entitled to, or such as may be agreed
upon by this State and the State of Kentucky."

It is obvious that the jurisdiction Illinois was
then entitled to was as far as low-water mark on the nor-
thern shore. The same provision contained in the Illinois
Constitution of 1848 is embraced in the Constitution of
1870.

The preamble of the Indiana Constitution of 1816 states
that it is formed consistent to the act of Congress enab-
ling the people of Indiana Territory to form a State.
There is here no claim of concurrent jurisdiction. Nor

[44]

is there one in the ordinance adopted by the first Constitutional Convention accepting the boundaries as fixed by Congress. That Constitution (art. v, sec. 2) fixes the jurisdiction of the Supreme Court with the limits of the State. But in the Constitution of 1851, thirty-five years after the beginning of its existence as a State, it asserted its claim to concurrent jurisdiction with Kentucky.

I shall not take time to consider the cases in the Supreme Court of the United States further than to say that the question has never there been decided.

Nor is it profitable to consider the cases of concurrent jurisdiction depending upon the grants embodied in the acts of Congress.

A claim of jurisdiction by one State over the land of another must be supported by some grant, or the claim fails. Kentucky has never granted to Indiana any jurisdiction over the Ohio river, concurrent or otherwise. It is beyond her power, as limited by the Constitution, to do so. (U. S. Const., art I., sec. 10.) If such jurisdiction in Indiana exists, it must be by virtue of the language of the compact, which to that end must be construed as creating a sort of springing use of jurisdiction for the benefit of States unborn. No stretch of construction can avail to extract from the language of the compact an implication which will give to a State not a party to the instrument, and not in being at the time of its execution, jurisdiction over the territory and within the boundary of another sovereignty, so as to authorize the grantee by implication to serve process and make arrests upon the territory of the other, and try offenders for acts committed upon foreign soil, or to impose penalties for acts which are not prohibited by the owner of the territory.

"There must be accurate and express treaty stipulation

between the contracting parties to confer extra-territorial jurisdiction." (Vattel, Law of Nations, 6 Am. Ed., 120.)

"Sovereignty united with domain establishes jurisdiction." (Vattel, p. 165.)

For the additional reasons given here, I concur with the opinion of the majority.

DISSENTING OPINION BY JUDGE HOBSON.

The question involved in this case is whether the process from the courts of Indiana may lawfully be served by her officers on the Ohio river.

In January, 1781, Virginia, by an act of her Legislature, ceded to the United States all right she had to the territory "northwest of the river Ohio." In December, 1789, another act, now known as the Compact with Virginia, was passed, under which the territory then styled the District of Kentucky, was permitted under certain conditions to be formed into an independent State. Under these acts the boundary line between Kentucky and the States lying northwest of the Ohio is the low-water mark on the northwest side of the river. (Handly v. Anthony, 5 Wheat., 374; Indiana v. Kentucky, 136 U. S., 329.)

Ordinarily, the laws of a State and the authority of its officers to execute its process are confined to its territorial limits, but the seventh condition of the Compact with Virginia is this: (Sec. 11 of Compact.)

"That the use and navigation of the river Ohio so far as the territory of the proposed State or the territory which shall remain within the limits of this Commonwealth lies thereon, shall be free and common to the citizens of the United States; and the respective jurisdictions of this Commonwealth and of the proposed State on the river as aforesaid, shall be concurrent only with the States which may possess the opposite shores of the river."

Since this act was passed, that part of Virginia which
still bordered on the Ohio river has been formed into the
State of West Virginia. The words, "the proposed
State," refer to Kentucky. The words, "river as afore-
said," refer to that part of the river which was included
in the act. The word "only" is used in the last clause be-
cause, though the use and navigation is to be free to all
the States, the concurrent jurisdiction on it was to be con-
fined to the States possessing the opposite shores. The
copula "and" connecting the two clauses of the sentence
shows that the last clause is not a limitation on
the first, but an additional condition annexed to the grant.

The meaning of the sentence is therefore, (1) That the
use and navigation of the Ohio so far as the territory of
West Virginia or Kentucky lies thereon shall be free and
common to the citizens of the United States; (2) that the
respective jurisdictions of West Virginia and Kentucky
on the river shall be concurrent with the States alone
which possess the opposite shores.

The question to be determined, so far as this case goes,
is: What concurrent jurisdiction is thus vested in Ken-
tucky and Indiana on the Ohio?

The original opinion is based upon the ground that only
concurrent legislative jurisdiction is conferred. But by
what authority can the general term "jurisdictions" be
curtailed in this way when there is nothing in the act to
sustain such a construction? The power to make laws
would be of no value without the power to enforce them.
The words, "respective jurisdictions of this Common-
wealth and of the proposed State," can not naturally be
understood as including only the legislative branch of the
Government. This court might with equal propriety de-
clare that only executive jurisdiction is meant as to say

that these terms include only legislative jurisdiction, for there is nothing in the act to warrant one limitation upon the natural meaning of the words "respective jurisdictions" rather than another.

In the separate concurring opinion, filed upon the re-argument of the case, this view is apparently abandoned, and I am not sure that I understand the ground clearly upon which the court means to rest its judgment; but as I understand that opinion, it holds that the words quoted are not a limitation upon Kentucky's jurisdiction; that the territory, and with it the jurisdiction to low-water mark on the northern shore, is vested in Kentucky, and that it is inhibited against parting with it or ceding concurrent jurisdiction over the river to the United States or to any other State than those which might possess the opposite shores. This seems to be only another way of stating a proposition urged with great earnestness in the earlier discussions of the case. It was urged that the concurrent jurisdiction referred to relates alone to the use and navigation of the river, or in other words, to maritime jurisdiction. It was insisted that the stipulation was directed mainly at the Federal Government to prevent the extension of the admiralty jurisdiction of the Federal courts, which subsequently took place. It has also been argued that the act being a compact between Kentucky and Virginia confers no rights except upon Kentucky.

All these propositions stand or fall together. The fundamental objection to them all is that if this were the meaning of the act it would only have referred to that part of the Ohio river lying along the Kentucky border, for if only an inhibition upon Kentucky was meant, or if rights were granted only to Kentucky, or if the aim was

to fence off the Federal Government, then there was no reason for defining in the act the rights of the States in that part of the Ohio river which did not border upon Kentucky. Another fundamental objection to either of these views is that the act of 1789 was passed just after the adoption of the Constitution of the United States, and before it had become firmly established. The act is a transcript of the two previous acts, one of which was passed five years before, when the Constitution of the United States had not been formed, and when the Legislature of Virginia could not possibly have had any of these things in mind.

The great old Commonwealth that had given an empire to the Federal Government and furnished it a large part of the talent that shaped its early history, had no such narrow purpose in view. These far-seeing men intended the Ohio river to be the boundary between the States bordering upon it, and to be a common highway for all the States. They foresaw that the territory thus ceded would one day be a center of population and that the great river would be dotted with towns and cities, and a great thoroughfare of commerce. At common law the respective jurisdictions on either side of a highway were concurrent on it. This rule, which the experience of ages had confirmed as necessary to secure peace and protect life and property among their ancestors, was well known to the people of Virginia; and the great statesmen who controlled her affairs intended to establish the same rule for the highway which had hitherto been exclusively within the jurisdiction of Virginia. Had it been intended by Virginia to retain her jurisdiction as it then stood, there was no need to mention in the act that part of the river which it left within her territory. And if it had

been intended to confer upon Kentucky exclusive juris-
diction to low-water mark on the northern shore, there
was no need to mention the States possessing the op-
posite shores, for this jurisdiction would have passed with
the grant of the soil.

The restriction of the concurrent jurisdiction to the
States possessing the opposite shores is of necessity a
grant of concurrent jurisdiction to both of them, for the
exclusion of all others is by necessary implication an in-
clusion of these States.   It can not fairly give one of
them an exclusive jurisdiction.   The purpose of the act
was to enable the States on both banks to protect their
people from the evil-minded on the river, which was made
a common highway for everybody.   The natural meaning
of the words is that "the respective jurisdictions" of Vir-
ginia on the river as they then existed should continue
in Virginia and Kentucky and be exercised by them con-
currently with the States possessing the opposite shores.
The clause in question is, by the express terms of the act,
made a condition of the grant of the territory to Ken-
tucky.   By plain terms, the respective jurisdictions of
Virginia and Kentucky on the river are placed on the
same footing as the respective jurisdictions of the States
opposite them.

The three acts passed by the Virginia Legislature on
the subject should be read together, and in construing
them we should bear in mind the situation at the time.
The title to the Ohio river was in Virginia.   There was
no one to dispute her right.   Having the whole title and
the power to dispose of it, she enacted these statutes,
having in view that which would best promote the settle-
ment and prosperity of the vast area that was then de-
pendent on the Ohio river as its only outlet.   Her inten-

tion was not only to guarantee to the people of the States possessing the opposite shores the free use of this great waterway, then so essential to them, but to clothe these States with power to protect persons on the river in life, liberty and property. Otherwise, the use and navigation of the river might be substantially destroyed and become a menace to society on either shore.

The Congress of the United States was granted no power over the river, and it was therefore not mentioned in any of the acts of Congress admitting into the Union the States of Kentucky, Indiana, Ohio and Illinois, for the rights of these States in the river passed to them directly from Virginia, and the General Government had nothing to grant. The Wabash, Missouri and Mississippi rivers stand on wholly different ground, for these lie in the territory ceded to the General Government and could be regulated by Congress, and only by it.

The position that the words of the act are too vague to constitute a grant of jurisdiction to the States possessing the opposite shores of the river has, so far as I have seen, no judicial sanction.

In Handly v. Anthony, 5 Wheat., 377, the United States Supreme Court, by Chief Justice Marshall, speaking of the act ceding the Northwest Territory and the compact with Virginia above referred to, said:

"It was intended then by Virginia, when she made this cession to the United States, and most probably when she opened her land office, that the great river Ohio should constitute a boundary between the States which might be formed on its opposite banks. This intention ought never to be disregarded in construing this cession."

"The compact with Virginia, under which Kentucky became a State, stipulates that the navigation and juris-

diction over the river should be concurrent between the
new States and the States which may possess the op-
posite shores of the said river. This term seems to be
a repetition of the idea under which the cession was
made."

In Church v. Chambers, 3 Dana, 274, this court sus-
taining the Kentucky statute forbidding the exportation
of slaves on the Ohio, said:

"The Ohio river, as far as it is a boundary of this State,
is within its jurisdiction. The eleventh article of the
compact with Virginia only guarantees to the citizens of
all the States 'free and common use and navigation of
the river,' and to 'the States possessing the shores oppo-
site to Virginia and Kentucky a concurrent jurisdiction.'

"A State having a concurrent jurisdiction of the Ohio
river may certainly pass laws for preventing crimes and
torts upon it without denying in the least degree to every
citizen of the United States equal right to the use and
navigation of it, according to the full spirit and policy
of the guaranty in the compact. And, therefore, Kentucky
had a right to declare that the abduction of slaves, or the
deportation or transportation of them, in vessels on the
Ohio river, within her jurisdiction without the consent of
the owners, and to their damage, should be unlawful."

Again, in Arnold v. Shields, 5 Dana, 22 [30 Am. Dec.,
669], the court, by Chief Justice Robertson, said:

"Jurisdiction, unqualified, being, as it is, the sovereign
authority to make, decide on and execute laws, a con-
currence of jurisdiction, therefore, must entitle Indiana to
as much power, legislative, judicial and executive, as that
possessed by Kentucky over so much of the Ohio river as
flows between them; and consequently, neither of them
can, consistently, with the compact, exercise any author-

ity over their common river, so as to destroy or impair, or obstruct the concurrent rights of the other."

Though this was not strictly necessary to the decision of the case before the court, it will be seen from the opinion that it is not one of the matters on which it reserved its judgment. It, therefore, shows the construction then placed by the court on the compact, and should not after so many years be departed from.

The question was again presented in McFall v. Commonwealth, 2 Met., 394, where an Ohio magistrate, who was convicted for marrying a couple on the Ohio river contrary to the Kentucky Statute, relied on the provisions of the compact giving concurrent jurisdiction to the States possessing the opposite shores. The court, holding the defense not made out, said:

"It does not appear from the admissions or proofs before referred to, that the offense charged was committed within the jurisdiction of 'Cincinnati township,' or within the jurisdiction of the State of Ohio, for the record contains no statute or other valid evidence showing that the latter State has ever assumed, or claimed, or asserted jurisdiction, exclusive or concurrent, over the place where the offense is proved to have been committed. The appellant has claimed exemption from the penalties imposed by the laws of the Commonwealth within whose limits he violated those laws, and has invoked the protection which, he claims, is afforded by the laws of another State, but has failed to show that any such laws exist. The word 'jurisdiction' as applied to a State, and as used in the compact with Virginia, imports nothing more than the power to govern by legislation; and without legislative enactments to enforce and carry out the jurisdiction so conferred, it can not of itself be regarded as operative

or effectual to protect the appellant or to defeat the right of our own tribunals to enforce and execute our own penal and criminal statutes."

It will be observed that in none of these cases was there a suggestion of the restricted view of the compact now taken by this court. In this case it appears that Indiana has asserted the jurisdiction conferred on her by the compact. It is provided in the Constitution of the State that it "shall have concurrent jurisdiction in civil and criminal cases with the State of Kentucky on the Ohio river" (section 2, article 14), and this provision is enforced in several statutes. The courts of Indiana have steadfastly maintained this jurisdiction. Thus in Carlisle v. State, 32 Ind., 55, the conviction of two men for murder committed on the Ohio river was sustained. The court said:

"The court below refused to charge the jury, that if they believed from the evidence that the acts charged were committed on the Ohio river, below low-water mark, they should acquit.

"The boundary of Spencer county, on the Ohio river, extends no farther than low-water mark. Cowden v. Kerr, 6 Blackf., 280; Stinson v. Butler, 4 Blackf., 285; Handly's Lessee v. Anthony, 5 Wheat, 374.

"The boundary in Kentucky, opposite to the county of Spencer, extends to low-water mark on the Indiana side of the Ohio river. McFall v. Commonwealth, 2 Met. (Ky.), 394."

The court here quotes section 11 of the compact with Virginia, and certain sections of the Constitution and statutes of Indiana. It then adds:

"By force of these provisions, the court of the county of Spencer has concurrent jurisdiction with the courts of Kentucky over crimes committed on the Ohio river."

This case was followed in Dugan v. State, 125 Ind., 130, 9 L. R. A., 321, where a judgment fining a steamboat pilot for violating the Indiana Sunday law by carrying on the Ohio on Sunday a Sunday excursion, was affirmed; and in Welsh v. State, 126 Ind., 71, 9 L. R. A., 664, where the same rule was followed for a violation on the river of the Indiana laws forbidding the sale of whisky without license.

The same view has been taken in West Virginia. In State v. Plants, 25 West Va., 119, 52 Amer. Rep., 211, a conviction was sustained for selling spirituous liquors without license where it appeared the sale was made from a boat tied up at the Ohio bank, thirty yards within the low-water mark and therefore within the territorial limits of the State of Ohio. The court said:

"We are in this case prepared to hold, that the jurisdiction of West Virginia is co-extensive with the water of the Ohio river, while it is confined within its banks, and that the State in the proper county has jurisdiction of offenses committed on a boat afloat on the Ohio river while confined within its banks, whether such boat is or is not fastened to some object on the bank. If this were not so, our citizens might with impunity violate our revenue and other laws. But without regard to the consequences that might follow if the State did not possess such jurisdiction, Virginia, which confessedly owned before the cession the territory through which the Ohio river runs, did not cede away her jurisdiction over the waters of the river, no matter what the stage was, so long as it was confined within its banks."

The same rule obtains where a river separates two States the thread of the stream being the dividing line, and by the act of Congress concurrent jurisdiction is given

to both on the river. Thus the middle of the Mississippi river is the line between Illinois and Missouri, and each is given "concurrent jurisdiction over the river" with the other. A collision occurred on the river east of the middle line and it was insisted that it was not, therefore, covered by the Missouri statute, but it was held otherwise. The court said:

"Jurisdiction, as applied to a State, signifies the authority to declare, and the power to enforce, the law, as well as the territory within which such authority and power may be exercised. Those were its meanings in the language from which we derived the word, and are its present meanings in our own.

"The jurisdiction of a State is co-extensive with its sovereignty. By conferring 'concurrent jurisdiction,' Congress intended by the act in question to declare that, subject to the other laws of the United States, transactions occurring anywhere on that river between the two States might lawfully be dealt with by the courts of either according to its laws, and that where a court of one State assumed jurisdiction in a particular case the same should be exclusive therein until relinquished." (Sanders v. St. Louis & New Orleans Anchor Line, 97 Mo., 26; 3 L. R. A., 390.)

The same view is taken in Illinois, Wiggins Ferry Co. v. Redding, 24 Ill. App., 265.

The center of the Mississippi is also the line between Iowa and Illinois, both having concurrent jurisdiction on the river. In State v. Mullen, 35 Iowa, 199, the defendant had been convicted of keeping a house of ill-fame on the river, and contended that the Iowa courts had no jurisdiction because the boat was anchored east of the middle line of the stream and therefore within the boundary of

Illinois. The court held otherwise, following the previous case of Gilbert v. Moline W. P. & Mfg. Co., 19 Iowa, 319, where the court said:

"There is an immense commerce on this great common highway. Water-crafts, rafts and boats of almost every kind and description are each day floating upon its waters. Thousands of persons are engaged in this commerce. Contracts are made and obligations assumed, for which those boats and crafts may, under certain proceedings, be made liable; injuries are inflicted upon persons and property by persons while on the river, for which they should be held answerable, criminally as well as civilly. If jurisdiction in all such cases was made to depend on the inquiry whether the boat or vessel was on one side or the other of the main channel, whether the injury was inflicted or crime committed east or west or north or south of such line, it can be readily seen that it would be frequently almost impossible to determine such jurisdiction, and that a mistake in this respect would prove fatal to the action or prosecution, and hence the reason of making the jurisdiction concurrent in all such cases. Such property and persons are, as a rule, transitory, moving here to-day and gone to-morrow."

The same rule was applied on a charge of keeping a gaming house, where it appeared that the boat was kept on the west, or Kansas, side of the Missouri river, the thread of the stream being the dividing line between the two States, and both being given concurrent jurisdiction on it. (State v. Metcalfe, 65 Mo. App., 681.)

So on the St. Croix, the center of which is the dividing line between Wisconsin and Minnesota, both having concurrent jurisdiction on the river. (Apsahl v. Judd, 30 Minn., 129; State v. George, 60 Minn., 505; State v. Cam-

eron, 2 Pinney, 495; Keater Lumber Co. v. St. Croix Boom
Co., 72 Wis., 95; [7 Am. St. R., 837.])

A number of other like authorities might be cited, but
it is unnecessary, as there is no conflict. The cases in-
volving islands, bridges, dams or other permanent struc-
tures resting on the soil are based on the ground that
these things follow the soil, and that the concurrent juris-
diction is only on the river. This distinction is well sus-
tained by authority. The case of Attorney General v.
D. & B. Railroad Co., 27 N. J., 631; M. & M. Railroad Co.
v. Wood, 2 Black, 435, and Keater Lumber Co. v. St. Croix
Boom Co., 72 Wis., 62, [7 Am. St. R., 837], cited in the opin-
ion are not, therefore in point. The opinion in Garner's
case, 3 Grat., 655, was placed by some of the judges on the
same ground, as the defendant was standing on the soil and
was held, therefore, not "on the river."

There is greater reason for the concurrent jurisdiction
on the river where the low-water mark on one side is the
line between the States than where the line is at the center
of the stream, for the reason that the State holding to
the water edge at low-water mark on its side of the stream
would otherwise be practically at the mercy of wrong-
doers on the river, and the policing of the stream would
be a burdensome tax in many cases on the other State,
with little corresponding benefit. Indiana has on the
shores of the Ohio the cities of Evansville, New Albany,
Jeffersonville, Madison, Lawrenceburg, Aurora, Mount
Vernon, Rockport, Vevay, Cannelton, Leavenworth and a
number of smaller towns. Concurrent jurisdiction is a
practical necessity in the administration of government
on the river. Otherwise the police boats maintained by
these cities will be no protection. A thief can sit along
side the wharfboat in open possession of stolen goods and

Meyler v. Wedding.

the entire people on the north shore of the river will be utterly unable to protect their harbors, landings or wharfs or other property from the army of river tramps here to-day, gone to-morrow, leaving no trace behind and only known to have been present from the stolen valuables that are not to be found.

It is said that what is lawful on one side of the river may be unlawful on the other, or punished differently. But the same may be true where the center of the stream is the dividing line, and universal experience has vindicated the wisdom of the rule giving both States concurrent jurisdiction in such cases.

In many years, no practical inconvenience has resulted from the concurrent jurisdiction exercised by Kentucky and Indiana on the river, and there is no reason for the apprehension of trouble in the future that may not be settled by the principles applied in other cases of conflict of laws. The two States have concurrent jurisdiction on the river, and neither can by its laws impair or control the jurisdiction of the other. The courts of the State first acquiring jurisdiction of the cause and the parties will retain it, and the courts of the other State will not interfere.

No question of conflict of law arises in this case. The only question is, whether the judgment of the Indiana court is void for want of jurisdiction because the process on which it was based was served on the Ohio river.

For the reasons indicated, it seems to me the court below properly held the judgment valid, and that the construction now adopted by this court for the first time, over a century after the act was passed, denies it fair effect and is unwarranted by the authorities. I therefore dissent from the judgment of the court.

JUDGE BURNAM CONCURS IN THIS OPINION.